**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA**

MOHAMMED UDDIN, et al.,                :
     Plaintiffs,                           :
                                :    CIVIL ACTION
               v.                     :
                                :    NO. 06-5275
ALEJANDRO MAYORKAS, DIRECTOR  :
OF THE BUREAU OF CITIZENSHIP      :
AND IMMIGRATION SERVICES, et al.,[1]  :
     Defendants.                          :

**May _15_, 2012**                                                      **Anita B. Brody, J.**

## MEMORANDUM

Plaintiffs Mohammed[2] and Arshia Uddin, husband and wife, bring suit against

Defendants Alejandro Mayorkas, Director of U.S. Citizenship and Immigration Services

("USCIS"),[3] Perry Rhew, Director of the Administrative Appeals Office of USCIS, and Tony

Dyson, Director of the Philadelphia Office of USCIS (collectively, "the Government").  The

Uddins seek judicial review, pursuant to the Administrative Procedures Act, 5 U.S.C. §§ 701-06,

of the Government's denial of their applications for adjustment of status to lawful permanent

---

[1] Under Federal Rule of Civil Procedure 25(d), Defendant Alejandro Mayorkas replaces Emilio Gonzalez as the current director of U.S. Citizenship and Immigration Services ("USCIS"), Defendant Perry Rhew replaces Robert Weinmann as the current Director of the Administrative Appeals Office of USCIS, and Defendant Tony Dyson replaces Karen Fitzegerald as the current Director of the Philadelphia Office of USCIS.

[2] Although Mr. Uddin's first name is spelled "Mohammad" in the Certified Administrative Record, I have chosen to spell it "Mohammed," which is how it appears in the caption of the case.

[3] A complete glossary of abbreviations is attached.

1

resident.[4]  The Uddins allege that the Government unlawfully considered information furnished

pursuant to Mr. Uddin's Special Agricultural Worker ("SAW") application as grounds for

denying his adjustment of status application.[5]  Currently pending before me are the parties' cross-

motions for summary judgment.[6]  For the reasons set forth below, I will grant Defendants'

motion for summary judgment.

## I. BACKGROUND

### 1. Introduction

Mohammed and Arshia Uddin are natives and citizens of Pakistan.  Mr. Uddin originally

entered the United States in 1984.  Certified Administrative Record of Mohammed Uddin

("CAR-MU") at 24, ¶ 1. Mrs. Uddin came to the United States on April 7, 1991 as a B-2

nonimmigrant visitor admitted for a period of six months.  Certified Administrative Record of

Arshia Uddin ("CAR-AU") at 164.  The Uddins are currently living in the United States without

lawful immigration status.  They are seeking protection from removal through Mr. Uddin's

employment-based application for adjustment of status to lawful permanent resident.  Because

Mrs. Uddin's application is derivative of Mr. Uddin's, the focus will be on Mr. Uddin's

---

[4] I exercise jurisdiction over the Uddins' claim pursuant to 28 U.S.C. § 1331.

[5] It is undisputed that Mrs. Uddin's adjustment application was also denied as her application was dependent on and derived from her husband's application.

[6] On January 20, 2010, I dismissed the Uddins' complaint for lack of jurisdiction and failure to exhaust administrative remedies.  *Uddin v. Gonzalez*, No. 06-5275, 2010 WL 199272 (E.D. Pa. Jan. 20, 2010).  The Uddins appealed the dismissal.  On July 15, 2011, the Court of Appeals for the Third Circuit vacated the dismissal and remanded the case "for a decision on the merits of the Uddins' claim that USCIS unlawfully made use of confidential information from Mr. Uddin's SAW application in adjudicating their applications for adjustment of status."  *Uddin v. Dir. of Bureau of Citizenship & Immigration*, 437 F. App'x 196, 200 (3d Cir. 2011).  In response to the remand, the parties have filed these cross-motions for summary judgment.

immigration history.

### 2.  Events Related to Mr. Uddin's Filing of His I-485 Adjustment Application

On May 2, 1997, Mr. Uddin was ordered removed *in absentia*.  CAR-MU at 247.  Mr.

Uddin successfully appealed the removal order to the Board of Immigration Appeals, and his

case was remanded to the immigration court for further proceedings.  *Id.*  The immigration court

vacated the removal order and reopened removal proceedings.  *Id.* at 281.  On November 27,

1998, Mr. Uddin's employer, Jembro Stores, Inc. ("Jembro") filed a I-140 Immigration Petition

for Alien Worker[7] on behalf of Mr. Uddin.  *Id.* at 245.  Mr. Uddin's I-140 petition was approved,

and on April 9, 2001, the court terminated Mr. Uddin's removal proceeding.  *Id.* at 186.  Shortly

after termination of his removal proceedings, Mr. Uddin filed an employment-based I-485

Application to Adjust Status to permanent residency,[8] pursuant to 8 U.S.C. § 1255(a).[9]  *Id* at 170.

---

[7] An alien seeking employment-based permanent residency must file with the Department of Homeland Security ("DHS") an I-140 Immigration Petition for Alien Worker, which is a request for classification as an alien eligible to apply for designation within a specified visa preference employment category.  *Khan v. Attorney Gen. of U.S.*, 448 F.3d 226, 228 n.2 (3d Cir. 2006).

[8] After an alien seeking employment based permanent residency receives a visa number under Form I-140 then the alien must file with DHS an I-485 Application to Adjust Status, which is a request for adjustment of status to that of lawful permanent resident.  *Khan*, 448 F.3d at 228 n.2.

[9] That section provides:

> The status of an alien . . . may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe, to that of an alien lawfully admitted for permanent residence if (1) the alien makes an application for such adjustment, (2) the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence, and (3) an immigrant visa is immediately available to him at the time his application is filed.

8 U.S.C. § 1255(a).

Mrs. Uddin also filed an adjustment application as a derivative of her husband's pending application.

### 3. Mr. Uddin's I-485 Adjustment Application and the Initial Denial of his Application

In his adjustment application based on his employment as a manager at Jembro, Mr. Uddin indicated on his Biographic Information form that he had been employed at Jembro since 1984. *Id.* at 188. In addition to his application, Mr. Uddin submitted a copy of his Pakistani passport. *See id.* at 194-206. Stamps on the passport denoted that Mr. Uddin had applied for benefits under the Special Agricultural Worker ("SAW") amnesty program. *Id.* This program was established by Congress in the Immigration Reform and Control Act of 1986, *see* U.S.C. § 1160, to provide alien farmworkers with lawful temporary residence status and eventually lawful permanent residence. *McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 483 (1991). Specifically, the passport stamps indicated that Mr. Uddin had received an I-688A employment authorization card, a card that was only issued to SAW applicants, and that he had re-entered the United States on three occasions under authorization of the SAW program.[10] CAR-MU at 194-206.

On March 14, 2005, the Uddins were interviewed regarding their adjustment applications. *Id.* at 166. During the interview, the District Adjudication Officer ("DAO") asked Mr. Uddin about his employment. *Id.* at 166, 411. Mr. Uddin informed the DAO that he had been working

---

[10] Mr. Uddin's passport shows that he was admitted to New York, NY on the following dates with the following SAW stamps: June 18, 1988 with a "I-688A"stamp; March 28, 1989 with a "SAW 210" stamp; and March 30, 1991 with a "1-688A 210" stamp. CAR-MU at 194-206.

at Jembro since his arrival in 1984 and had never worked anywhere else in the United States. *Id.*
at 166; 411-13.  Mr. Uddin's attorney asked the Supervisory Adjudication Officer ("SAO") why
Mr. Uddin was being questioned about his work history. *Id.* at 413.  The SAO "pointed out that
[Mr. Uddin's] testimony regarding his work history in the USA ruled out the possibility that he
was ever a class member for SAW eligibility."[11] *Id.*  Mr. Uddin's attorney agreed that Mr. Uddin
"was not a class member, but insisted that nothing relating to the SAW application could be
used" in determining Mr. Uddin's adjustment application. *Id.*  The attorney was told that no one
had looked at Mr. Uddin's SAW application or SAW file, which was housed at a different
location. *Id.* at 166, 413.  The attorney alleged that Mr. Uddin did not know what was claimed
on the SAW application. *Id.* at 166.  However, he "was reminded that the established procedure
for the SAW Program included an interview where the applicant, with translator if necessary,
would declare the basis for his claim for class membership in the SAW Program." *Id.*

On August 29, 2005, USCIS denied Mr. Uddin's adjustment application.[12] *Id.*  USCIS
determined that Mr. Uddin's testimony that he had never worked anywhere other than Jembro
established that he was not eligible for the SAW program. *Id.* at 167  USCIS further determined
that the SAW stamps in Mr. Uddin's passport were evidence that he had submitted a fraudulent
SAW application, and fraudulently obtained a temporary employment card and travel
authorization under the SAW program. *Id.*  As a result, USCIS concluded that 8 U.S.C. §

---

[11] In order to qualify for the SAW program, an immigrant had to establish that s/he had
performed 90 days of agricultural work in the United States during the 12-month period prior to
May 1, 1986. *McNary*, 498 U.S. at 483.

[12] Mrs. Uddin's adjustment application was also denied because it was derivative of her
husband's.  CAR-AU at 83.

5

1182(a)(6)(C)(i) rendered Mr. Uddin statutorily ineligible for adjustment of status.  *Id.*  Under §

1182(a)(6)(C)(i), "Any alien who, by fraud or willfully misrepresenting a material fact, seeks to

procure (or has sought to procure or has procured) a visa, other documentation, or admission into

the United States or other benefit provided under this chapter is inadmissible."

### 4.  Mr. Uddin's Motion for Reconsideration, the Notice of Intent to Deny, and his Response

On February 5, 2007, USCIS granted Mr. Uddin's motion for reconsideration of the

denial of his adjustment application.  Upon reconsideration, USCIS issued a Notice of Intent to

Deny ("NOID") Mr. Uddin's application.  *Id.* at 97.  In the NOID, USCIS explained that Mr.

Uddin's testimony that he had never worked anywhere other than Jembro conflicted with the

evidence that he had been a member of the SAW program.  *Id.* at 98.  USCIS indicated that these

contradictory facts suggested that Mr. Uddin "may have sought to obtain adjustment of status in

the United States by fraud or willful misrepresentation of a material fact, either in connection

with [his] SAW application or [his] current application for adjustment of status."  *Id.* at 99.

Accordingly, USCIS  intended to deny Mr. Uddin's adjustment application because such fraud or

willful misrepresentation would render him inadmissible pursuant to 8 U.S.C. § 1182(a)(6)(C)(i).

*Id.*

In response to the NOID, Mr. Uddin reiterated "his objection to the CIS investigation of

this matter and its continuing use of information garnered from the Applicant's SAW

application," and submitted additional information verifying and explaining his SAW

application.  *Id.* at 21-96.  Mr. Uddin's submissions included the following SAW related

documents: (1) an affidavit; (2) copies of his three Employment Authorization Cards; (3) a copy

of his passport with the SAW stamps; (4) a copy of the decision denying him SAW status; and (5) a copy of his appeal of his denial of SAW status. *Id.* at 21-22.  Mr. Uddin's submissions revealed that he applied for the SAW program on December 29, 1987, and his application was denied on April 18, 1990. *Id.* at 36-39. The denial decision indicated that Mr. Uddin's SAW application was supported by the affidavit of a farm owner who had pled guilty to supplying fraudulent SAW affidavits, and that Mr. Uddin was not on a list of individuals employed at the farm during the time he claimed to work there. *Id.* at 37-38.  Accordingly, USCIS denied his SAW application because he failed to prove that he had performed qualifying agricultural work for the requisite number of days. *Id.* at 39.   Mr. Uddin appealed the denial of his SAW application and maintained that he had worked on a farm "between August and July of 1985," but did not have any further documentation to support his contention. *Id.* at 35.  The record does not indicate what became of Mr. Uddin's appeal of the denial of his SAW application; however,  Mr. Uddin explained that he stopped pursuing his SAW application and using the benefits of the SAW program later in 1991 when he "came to the realization that it [was] wrong." *Id.* at 26.

In his affidavit, Mr. Uddin swore that he "never knew at the time these papers or the appeal was being prepared that it was wrong to file them." *Id.* at 25.  Mr. Uddin explained that when he applied for SAW, he barely spoke any English and did not know he was filing a "legal application" because an individual named Zafar Khan filed the application on his behalf and did most of the talking to the immigration officer during his interview. *Id.* at 24.  Additionally, Mr. Uddin stated that Mr. Khan did not explain that the application "had any connection to claiming agricultural work." *Id.*  Mr. Uddin also stated that, following the denial of his application, he met with a lawyer for about an hour before he decided to file an appeal. *Id.* at 25.  He then chose to

file an appeal because "[o]ther people in [his] community told [him] it was worth asking for an appeal of a case because sometimes people were winning them." *Id.* Also, "[t]here was a rumor that even if you did not work on a farm before you could still get approved by working later." *Id.*

### 5. The Final Denial of Mr. Uddin's Adjustment Application

On June 8, 2007, USCIS issued its final decision denying Mr. Uddin's adjustment application. *Id.* at 2-7. In its decision, USCIS emphasized that the immigration officer who had interviewed Mr. Uddin in 2005 had never reviewed or had access to Mr. Uddin's SAW application. *Id.* at 5. Rather, Mr. Uddin had raised the issue of his prior SAW application when he presented evidence of his involvement in the SAW program with his adjustment application. *Id.* USCIS found many discrepancies and implausibilities in Mr. Uddin's claim that he was unaware that he was perpetrating a fraud during the time period in which he attempted to gain temporary resident status under the SAW program. The following is a summary of the key discrepancies that USCIS identified:

• Although Mr. Uddin claimed in his affidavit that he was "unwittingly led into filing a fraudulent application by Mr. Zafar Khan," he failed "to provide crucial details surrounding his encounter with Mr. Khan." *Id.* at 2-3. Details that were missing included an explanation as to why Mr. Khan sought Mr. Uddin out at Jembro and offered to help him get a green card, and why Mr. Uddin trusted Mr. Khan enough to give him $1,000 on the day Mr. Khan walked into Jembro. *Id.* at 3.

• Mr. Uddin alleged in his affidavit that he had an interview with the former Immigration

and Naturalization Service ("INS")[13] regarding his SAW application.  *Id.*  Mr. Uddin

"claimed [he] had no idea that the application [h]e signed or this interview had any

connection to agricultural work because [he] did not speak any English at the time and

Mr. Khan did not advise [him] so, and if there were any fraudulent claims made at the

time, that [he] could not have been aware of them because Mr. Khan spoke on his

behalf."  *Id.*  USCIS found this story implausible.  First, it found it implausible that the

interviewing officer did not directly interview Mr. Uddin, especially since the regulations

require an interview of the applicant and place the burden on the applicant to establish

prima facie eligibility for SAW benefits.  *Id.*  Second, the claim that Mr. Uddin spoke

almost no English was unbelievable because Mr. Uddin passed both his Secondary

School Certificate Examination and Higher Secondary Certificate Examination in

Pakistan, both certificates were issued in English, and both stated that English was a

compulsory subject.  *Id.* at 4.  Additionally, USCIS could not understand how Mr. Uddin

could successfully perform his duties as a manager at Jembro for three years if he spoke

almost no English because his responsibilities included filling out company forms and

using the telephone and fax.  *Id.*  Thus, USCIS concluded that "contrary to [his] claim,

[Mr. Uddin's] English ability was not so poor that [he] could not have understood the

basic nature of [his] SAW application or *anything* said during his interview or stated on

any written application."  *Id.*

---

[13] "On March 1, 2003, Congress transferred the INS's functions to the Bureau of
Immigration and Customs Enforcement (ICE) and the U.S. Customs and Immigration Service
(USCIS) of the United States Department of Homeland Security (DHS)."  *Biskupski v. Attorney
Gen. of U.S.*, 503 F.3d 274 at 277 n.1 (3d Cir. 2007).

- Mr. Uddin stated that he stopped pursuing his SAW application or any benefits derived
  from it once he realized sometime in the later part of 1991 that it was unlawful. *Id.*
  However, in 1990, he appealed the denial of his SAW application because of rumors that
  "even if you did not work on a farm before you could still get approved by working later."
  *Id.* (internal quotation marks omitted).  USCIS found these statements "inherently
  contradictory" because "on one hand [Mr. Uddin was] claiming [he] had no knowledge
  prior to 1991 that the SAW program had any connection to agricultural work, but on the
  other hand, [he was] acknowledging that [he] knew that SAW program required
  agricultural work when [he] filed [his] appeal in 1990 . . . ." *Id.*

- USCIS also found it dubious that Mr. Uddin did not know that the SAW application
  required agricultural work until 1991 because his NOID and the denial of his application
  explained that he had no proof of employment as an agricultural worker, which was a
  requirement of the SAW program.  *Id.* at 4-5.  Moreover, Mr. Uddin's hour-long
  discussion of his appeal with a new attorney, and his filing of an appeal in which he
  claimed to have performed the requisite agricultural work, added to the implausibility of
  his story.  *Id.*  According to USCIS, Mr. Uddin "provided no plausible explanation as to
  how or why, since [he] was the one who hired Mr. Hinds [the new attorney], [he] would
  not know the contents of [his] appeal or even not know what [he was] really appealing."
  *Id.* at 5.

After detailing each of these discrepancies in Mr. Uddin's story, USCIS provided the following
synopsis:

> You claimed the following factors vindicate you of any wrongdoing in your (now

apparent) unlawful SAW application: that Mr. Khan solicited you at Jembro with a fraudulent green card scheme; you were unaware of anything that he claimed on your original SAW application; you never once reviewed any applications submitted on your behalf; you never were asked any questions during your interview other than your name; you did not understand what was said during your interview due to your lack of English skills; you sought a new attorney to file an appeal but were again unaware of the contents of that appeal or the legal basis for the appeal; that the new attorney you sought, Mr. Hinds, also filed a fraudulent appeal on your behalf without your knowledge; and that you heard untrue rumors around the community that you could have obtained SAW benefits by working on a farm after approval or that it was worth it to appeal. However, as discussed above, each one of these claims, alone, is questionable and is contradicted by other information; when considered as a whole, these claims create a highly implausible story. You provided no documentary evidence to support any of your claims although you bear the burden of proof to establish your eligibility for the immigration benefits you are seeking. Not only have you failed to provide complete explanations for the discrepancies noted in the notice of intent to deny, but the testimony you now offer presents even more discrepancies.

*Id.* Based on the above analysis, USCIS concluded that Mr. Uddin was ineligible for adjustment of status pursuant to 8 U.S.C. § 1182(a)(6)(C)(i) because he had "provided unresolved, contradictory and incredible testimony in pursuit of [his] instant adjustment application, which amount[ed] to [] providing fraudulent statements in an attempt to obtain adjustment of status."[14]

*Id.* at 6. Mrs. Uddin's adjustment application was also denied because it was derivative of her husband's application. CAR-AU at 2.

## II. LEGAL STANDARD

The parties' motions for summary judgment ask me to determine whether USCIS lawfully denied the Uddins' adjustment applications. According to Federal Rule of Civil

---

[14] USCIS also denied Mr. Uddin's application as a matter of discretion. However, it is "clear from the administrative record that Mr. Uddin's alleged fraud– the very same that formed the basis for the eligibility determination– was in fact the motivating force behind USCIS' 'discretionary' denial of adjustment of status." *Uddin v. Dir. of Bureau of Citizenship & Immigration*, 437 F. App'x at 200. Therefore, the only issue is whether USCIS' denial of Mr. Uddin's application was improperly based on information from Mr. Uddin's SAW application.

Procedure 56(a), summary judgment will be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Unlike the typical summary judgment action, the Uddins are seeking judicial review under the Administrative Procedure Act ("APA"). While "[s]ummary judgment is the proper mechanism for deciding, as a matter of law, whether an agency action is supported by the administrative record and consistent with the APA standard of review . . . [b]ecause . . . 'the district judge sits as an appellate tribunal' in such cases, *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001), the usual summary judgment standard does not apply." *UPMC Mercy v. Sebelius*, 793 F. Supp. 2d 62, 67 (D.D.C. 2011); *accord Occidental Eng'g Co. v. I.N.S.*, 753 F.2d 766, 770 (9th Cir. 1985) (explaining that summary judgment in an original district court proceeding "is appropriate only when the court finds there are no factual issues requiring resolution by trial"; whereas, summary judgment in a case where the district court is reviewing the decision of an administrative agency under the APA "is an appropriate mechanism for deciding the legal question of whether the agency could reasonably have found the facts as it did.")

Under the APA, a district court may only hold unlawful and set aside agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Generally, "[i]n applying that standard, the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973). "'[A] court is not to substitute its judgment for that of the agency' in an APA challenge." *NVE, Inc. v. Dep't of Health & Human Servs.*, 436 F.3d 182, 190 (3d Cir. 2006) (quoting *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v.*

12

*State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  "Reversal is appropriate only where the administrative action is irrational or not based on relevant factors."  *Id.*  In determining whether an agency acted arbitrarily and capriciously, a district examines "whether the agency relied on factors outside those Congress intended for consideration, completely failed to consider an important aspect of the problem, or provided an explanation that is contrary to, or implausible in light of, the evidence."  *Id.*

## III.  DISCUSSION

### 1.  Significant Issues of Material Fact

The Uddins first argue that there are significant issues of material fact that prevent the court from deciding this case on summary judgment.  They ask the court to deny summary judgment in order to allow discovery.  The Government counters that it has provided the full administrative record and that because this case is reviewed under the APA there can be no factual disputes.  As discussed *supra*, under the APA, "judicial review of administrative action is limited to the administrative record."  *Id.*  Moreover, "[t]here is a strong presumption against discovery into the administrative proceedings born out of the objective of preserving the integrity and independence of the administrative process."  *Id.* at 195.  The Third Circuit has indicated an exception to the prohibition on discovery in APA review cases where: (1) the plaintiff alleges bias on the part of the agency; or (2) factors indicate that the administrative record submitted to the district court is incomplete.  *Id.* at 195-96.  The Uddins neither demonstrate bias on the part of USCIS nor that the administrative record is incomplete.[15]  Therefore, they are not entitled to

---

[15] Initially, the Uddins argued that the administrative record was incomplete because the Government had redacted memoranda prepared by the DAO and the SAO pertaining to the Uddin's adjustment interview on March 14, 2005.  This argument is moot because the

discovery.

## 2.  Special Agricultural Worker Confidentiality Provision

In the alternative, the Uddins argue that they are entitled to summary judgment because the administrative record demonstrates that USCIS unlawfully used information furnished pursuant to Mr. Uddin's SAW application as grounds for denying his adjustment of status.  In contrast, the Government contends that the administrative record demonstrates that information in Mr. Uddin's SAW application was not improperly used to deny Mr. Uddin's application.  The Government avers that the decision to deny the Uddins' adjustment applications was not arbitrary and capricious; therefore, the Government is entitled to summary judgment.

"The Immigration Reform and Control Act of 1986 (Reform Act) constituted a major statutory response to the vast tide of illegal immigration that had produced a 'shadow population' of literally millions of undocumented aliens in the United States." *McNary,* 498 U.S. at 481.  As part of the Reform Act two amnesty programs were established "to allow existing undocumented aliens to emerge from the shadows." *Id.* at 482-83.  The SAW program is one of these amnesty programs.  *Id.*  Under SAW, the Attorney General was required to adjust the status of any alien who resided in the United States and performed seasonal agricultural work for at least 90 man-days during the 12-month period ending on May 1, 1986.  8 U.S.C. § 1160(a)(1).  The Reform

---

Government has since turned over these memoranda. The Uddins also argue that the administrative record is incomplete because it does not include any reference to the immigration court's 2001 decision to terminate removal proceedings.  However, this proceeding is separate and unrelated to the Uddins' applications for adjustment of status and was not part of the record USCIS considered in its decision to deny their applications.  *See Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 792 (D.C. Cir. 1984) ("If a court is to review an agency's action fairly, it should have before it neither more nor less information than did the agency when it made its decision.").

Act required the Attorney General first to adjust the status of these aliens to lawfully admitted for temporary residence, and then eventually to aliens lawfully admitted for permanent residence. *Id.* § 1160(a)(1)-(2). A key feature of the SAW program is its confidentiality provision which prohibits the use of "information furnished by the applicant pursuant to an application filed under this section for any purpose other than to make a determination on the application . . . ." *Id.* § 1160(b)(6)(A)(i). Legislative history indicates that the purpose of this confidentiality provision was to encourage aliens who would otherwise be afraid of apprehension by the INS to come forward and apply for legalization. *See* Pub. L. 99-603, H.R. 99-682(I), 99th Cong. 2nd Sess. *reprinted in* 1986 U.S.Code Cong. & Admin. News, 5649, 5677.

When Mr. Uddin applied for adjustment of status, he included a copy of his passport with his application. Three stamps on Mr. Uddin's passport indicated that he had participated in the SAW program. Although the SAW program required Mr. Uddin to have performed agricultural work, Mr. Uddin testified, during his adjustment interview, that he had never worked anywhere other than Jembro. Based on this discrepancy, USCIS initially denied Mr. Uddin's application. After successfully moving for reconsideration of his denial, USCIS sent Mr. Uddin a NOID explaining that it intended to again deny Mr. Uddin's application because of this discrepancy. In response to the NOID, Mr. Uddin submitted additional information about his SAW application. Based on all of the information it had received, USCIS concluded that Mr. Uddin was ineligible for adjustment of status pursuant to 8 U.S.C. § 1182(a)(6)(C)(i) and issued a final denial of his application. At no point during the entire process did USCIS ever view or have access to Mr. Uddin's SAW application. Mr. Uddin contends that USCIS violated SAW's confidentiality provision when it questioned him about his employment history to determine whether he had

15

ever been an agricultural worker; this occurred after USCIS discovered from Mr. Uddin's passport stamps that he had been in the SAW program.

Mr. Uddin's challenge requires construction of the meaning of § 1182(a)(6)(C)(i).  "The starting point in every case involving construction of a statute is the language itself." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 197 (1976) (internal quotation marks omitted).  "If the statute's plain language is unambiguous and expresses that intent with sufficient precision, [I] need not look further.  If the plain language fails to express Congress' intent unequivocally, however, [I] will examine the surrounding words and provisions in their context." *Allen ex rel. Martin v. LaSalle Bank, N.A.*, 629 F.3d 364, 367 (3d Cir. 2011) (citation omitted).  Where "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984).

Although there are a handful of cases that have addressed the SAW confidentiality provision, only two cases have addressed sufficiently similar factual scenarios to warrant discussion.  In *Soriano-Vino v. Holder*, 653 F.3d 1096, 1097 (9th Cir. 2011), the plaintiff was returning from abroad when she was stopped for questioning by an INS inspector.  The inspector noticed that a code on the plaintiff's green card identified her as a SAW applicant and proceeded to ask her questions about her employment history.  *Soriano-Vino*, 653 F.3d at 1097-98.  During the interview, the plaintiff signed a sworn statement admitting that she committed fraud to obtain her status under the SAW program.  *Id.* at 1097.  Based on this admission, the plaintiff was held ineligible for cancellation of removal due to fraud.  *Id.* at 1098.  The plaintiff alleged that questioning her about potential fraud in her application violated the SAW confidentiality

16

provision. *Id.* at 1099.  In *Lopez v. Ezell*, 716 F. Supp. 443, 444 (S.D. Cal. 1989), plaintiffs

sought a preliminary injunction to prevent border patrol agents from asking individuals with

documents bearing stamps indicating that they were SAW applicants questions concerning

potential fraud with respect to their applications. "Plaintiffs characterize[d] the information

obtained by the agents' questioning of aliens as 'information furnished pursuant to a SAW

application' and therefore confidential and immune from inquiry." *Lopez*, 716 F. Supp. at 445.

In both cases, the courts held that no violation of the SAW confidentiality provision occurred.

*Soriano-Vino*, 653 F.3d at 1101; *Lopez*, 716 F. Supp. at 446-47.

The Ninth Circuit in *Soriano-Vino* found that "Congress was as concerned with fraud in

the application process as it was with shielding applicants from unauthorized disclosure of the

SAW application contents."  653 F.3d at 1101.  The court refused to adopt an "approach [that]

would prevent any investigation of fraud that referenced any information contained in the SAW

application, even if the information was not obtained from the application" because it would

"patently thwart[] Congress's expressed intent." *Id.*  The Ninth Circuit concluded that the plain

language of the confidentiality provision limited its applicability to information in the application

itself, and noted that "[a]pplying the confidentiality provision to information that was not

obtained from the application would violate a cardinal principle of statutory interpretation– that a

statute be analyzed and applied in accordance with its plain language." *Id.*  Thus, the *Soriano-*

*Vino* court held that "there is no violation of the SAW confidentiality provisions when the

challenged information is obtained as the result of questioning at an inspection checkpoint rather

than from the application itself." *Id.*

In *Lopez*, the court concluded that "[t]he language of the statute, interpreted in a logical

17

fashion, makes only the application and any information taken from the application confidential. On its face, the language of section 1160(b)(6) does not extend to the information not obtained directly from the application itself."  716 F. Supp. at 445.  However, recognizing that the language could be deemed ambiguous, the court also examined legislative history.  *Id.*  In its examination the court uncovered legislative history explaining that "'[t]he confidentiality of the records is meant to assure applicants that the legalization process is serious, and not a ruse to invite undocumented aliens to come forward and only to be snared by the INS.'" *Id.* at 45-46 (quoting Pub. L. 99-603, H.R. 99-682(I), 99th Cong. 2nd Sess. *reprinted in* 1986 U.S.Code Cong. & Admin. News, 5649, 5677).  The court also acknowledged  that Congress was concerned with fraud in the application process.  *Id.* at 446 (referencing § 1160(b)(6)(A) which exempted information used to enforce the fraud penalty from the confidentiality provision).  The court noted that the "questioning of aliens by border agents is an act independent of the application process." *Id.*  After considering the plain language of the statute and its legislative history, the court held that the confidentiality provision should not "be so broadly construed as to completely immunize the underlying facts contained in the application from any independent inquiry." *Id.* at 447.

As in *Soriano-Vino* and *Lopez*, no information regarding Mr. Uddin's SAW status was ever obtained from the application itself.  Rather, similar to *Soriano-Vino* and *Lopez*, Mr. Uddin's SAW status was discovered because of stamps on a document that he submitted to USCIS and the challenged information was then obtained as a result of questioning by USCIS and in response to the NOID issued by USCIS.

The confidentiality provision prohibits the use of "information furnished by the applicant

18

pursuant to an application filed under this section for any purpose other than to make a determination on the application . . . ."  *Id.* § 1160(b)(6)(A)(i).  In a case interpreting the confidentiality provisions of section 245A(c)(5) of the Immigration and Nationality Act, which also prohibits the use of "information furnished by the applicant pursuant to an application filed under this section . . . ,"  8 U.S.C. § 1255a(c)(5), the Third Circuit explained that the "ordinary meaning of 'pursuant to' is 'in compliance with; in accordance with; under.'"  *Patel v. Attorney Gen. of U.S.*, 599 F.3d 295, 298 (3d Cir. 2010) (quoting *Black's Law Dictionary* (8th ed. 2004)).  Interpreting § 1160(b)(6)(A)(i) using the ordinary meaning of the phrase "pursuant to" it becomes clear that the information Mr. Uddin provided about his SAW status and employment history was not given to USCIS "in compliance with" his application and does not fall "under" his application.  Moreover, the statute further provides:

> Nothing in this paragraph shall be construed to limit the use, or release, for immigration enforcement purposes or law enforcement purposes of information contained in files or records of the Service pertaining to an application filed under this section, other than information furnished by an applicant pursuant to the application, or any other information derived from the application, that is not available from any other source.

8 U.S.C. § 1160(b)(6)(C)(i).  Thus, the confidentiality provision also provides that while the application process itself cannot be used as a means to deny adjustment of status, information obtained from an independent source may be used as grounds for a denial.  *See McNary*, 498 U.S. at 484 (explaining that under the confidentiality provision "the application process could not be used as a means of identifying deportable aliens; rather, the initiation of a deportation proceeding had to be based on evidence obtained from an independent source.").  The information that USCIS used to deny Mr. Uddin's adjustment of status was not obtained from the

SAW application process; rather, it was obtained from an independent source– the questioning of Mr. Uddin and his responses to the NOID.  I agree with the conclusion reached in *Soriano-Vino* and *Lopez* that the plain language of the statute leads to the conclusion that the confidentiality provision applies exclusively to information in the application itself.[16]  Therefore, USCIS did not violate the confidentiality provision in reaching its decision to deny Mr. Uddin's adjustment application.[17]

The only remaining consideration is whether USCIS' decision to deny Mr. Uddin's adjustment application on the basis that he was ineligible for adjustment of status pursuant to 8 U.S.C. § 1182(a)(6)(C)(i) was arbitrary and capricious.  "Any alien who, by fraud or willfully misrepresenting a material fact, seeks to procure (or has sought to procure or has procured) a

---

[16] Because the statute is unambiguous, I need not explore legislative intent.  I note, however, that legislative history does not contravene my conclusion.  While Congress created the confidentiality provision to assure "'applicants that the legalization process is serious, and not a ruse to invite undocumented aliens to come forward only to be snared by the INS,'" *Lopez*, 716 F. Supp. At 445 (quoting Pub. L. 99-603, H.R. 99-682(I), 99th Cong. 2nd Sess. *reprinted in* 1986 U.S.Code Cong. & Admin. News, 5649, 5677), it certainly did not create it with the intention of immunizing fraudulent SAW applicants from negative immigration consequences.  It is clear from the penalties provided in the statute for false statements in SAW applications that Congress was very concerned with fraudulent applications.  *See* 8 U.S.C. § 1160(b)(7).

[17] Although the Uddins refer to the Board of Immigration Appeal's decision in *In Re Masri*, 22 I. & N. Dec. 1145 (BIA 1999), my decision is not dictated by the outcome in that case.  As the Ninth Circuit has explained:

In *Masri*, it was undisputed that the INS procured evidence directly from the applicant's SAW application. Because the evidence used by the agency fell within the express prohibition of the statute's confidentiality provision, the Board held that the "clear and unequivocal" language of the statute prohibited use of information from the SAW application.

*Soriano-Vino*, 653 F.3d at 1101 (citing *In Re Masri*, 22 I. & N. Dec. at 1146, 1150).  Unlike in *Masri*, USCIS never looked at, or had access to, Mr. Uddin's SAW application.

visa, other documentation, or admission into the United States or other benefit provided under this chapter is inadmissible."  8 U.S.C. § 1182(a)(6)(C)(i).  While proof of fraud requires that USCIS establish that Mr. Uddin had an intent to deceive, proof of willful misrepresentation does not.  *Mwongera v. I.N.S.*, 187 F.3d 323, 330 (3d Cir. 1999).  "The element of willfulness is satisfied by a finding that the misrepresentation was deliberate and voluntary."  *Id.* (internal quotation marks omitted).  Therefore, USCIS' decision that Mr. Uddin was ineligible pursuant to § 1182(a)(6)(C)(i) does not have to rest on proof that Mr. Uddin intended to deceive; rather, Mr. Uddin's "knowledge of the falsity of the representation will suffice."  *Id.*

USCIS concluded that Mr. Uddin was ineligible for adjustment of status pursuant to § 1182(a)(6)(C)(i) because he had "provided unresolved, contradictory and incredible testimony in pursuit of [his] instant adjustment application, which amount[ed] to [] providing fraudulent statements in an attempt to obtain adjustment of status."  CAR-MU at 6.  Two material statements that USCIS alleges were fraudulently made by Mr. Uddin in his attempt to obtain adjustment of status are: (1) he did not know that his SAW application was unlawful until later in 1991; and (2) he never attempted to obtain any immigration benefits by fraud of willful misrepresentation of material facts.

USCIS has identified several discrepancies that support its finding that Mr. Uddin's statements are fraudulent.  For example, Mr. Uddin alleges that he did not know until later in 1991 that the SAW program required agricultural work because he spoke almost no English.  This assertion is belied by the fact that Mr. Uddin, while in Pakistan, received a Secondary School Certificate and Higher Secondary Certificate issued in English, which stated that English was a compulsory subject.  Moreover, by the time Mr. Uddin filed his SAW application, he had

21

already been working at Jembro for three years doing such tasks as filing out company forms and using the telephone and fax; these tasks could not be accomplished without some understanding of the English language.  The record supports USCIS' finding that Mr. Uddin spoke some English.  Therefore, it was reasonable for USCIS to conclude that Mr. Uddin knew prior to 1991 that the SAW program required agricultural work because he was interviewed as part of the application process, and received a NOID and a denial of his application explaining that he was not eligible for the SAW program due to his failure to provide proof of alleged agricultural work performed.  Even if Mr. Uddin was somehow unaware of the agricultural requirement at the time his application was denied, he met with a new attorney for an hour and then filed an appeal again alleging that he had performed the required agricultural work.  Although Mr. Uddin contends that at the time he filed his appeal, he didn't know that agricultural work was a requirement of the SAW program, he simultaneously claims that the reason he filed an appeal was because of rumors that "even if you did not work on a farm before you could still get approved by working later."  CAR-MU at 4.  Given these multiple discrepancies in Mr. Uddin's statement that he did not know until later in 1991 that his SAW application was unlawful, it was reasonable for USCIS to conclude that this statement was fraudulent.

Admittedly, Mr. Uddin has never performed any agricultural work while in the United States.  Thus, USCIS rationally concluded that Mr. Uddin's statement that he never attempted to obtain any immigration benefits by fraud of willful misrepresentation of material facts was fraudulent because Mr. Uddin knowingly misrepresented in his SAW application and/or in his appeal of denial of his application that he had performed agricultural work.  The record demonstrates that USCIS did not abuse its discretion when it denied Mr. Uddin's adjustment

application on the basis that he was ineligible for adjustment of status pursuant to 8 U.S.C. § 1182(a)(6)(C)(i).  USCIS also did not abuse its discretion when it denied Mrs. Uddin's adjustment application because it was derivative of her husband's application.

## IV.  CONCLUSION

For the reasons stated above, I affirm USCIS' denial of the Uddins' adjustment applications.  Therefore, I will grant Defendants' motion for summary judgment and deny Plaintiffs' motion for summary judgment.

s/Anita B. Brody

_____

ANITA B. BRODY, J.

Copies **VIA ECF** on _____ to:        Copies **MAILED** on _____ to:

## Glossary of Abbreviations

"APA" –  Administrative Procedure Act

"CAR-AU" –  Certified Administrative Record of Arshia Uddin

"CAR-MU" –  Certified Administrative Record of Mohammed Uddin

"DAO" –  District Adjudication Officer

"DHS" –  Department of Homeland Security

"INS" –  Immigration and Naturalization Service

"NOID" –  Notice of Intent to Deny

"Reform Act" –  Immigration Reform and Control Act of 1986

"SAO" –  Supervisory Adjudication Officer

"SAW" –  Special Agricultural Worker

"USCIS" – U.S. Citizenship and Immigration Services